Federico Pacheco et al., as Heirs of Nicolasa Díaz Mojica, Plaintiffs and Appellants, *v.* Government of the Capital, etc., Defendants and Appellees.

No. R-63-89.       Decided April 18, 1966.

*P. J. Santiago Lavandero* for appellants. *Adelaida Vicente de Souffront, James G. Shine, Alberto Picó,* and *José R. Lebrón Velázquez* for the Government of the Capital.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Hernández Matos, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

The heirs of Nicolasa Díaz Mojica filed an action against the Government of the Capital claiming damages suffered as a result of their predecessor's death. In the complaint they alleged, in synthesis, that Nicolasa Díaz Mojica died on March 27, 1950 as a result of an anaphylactic shock caused by an achromycin shot administered to her on said day in the out-patient clinic of Puerta de Tierra, property of and operated by the Government of the Capital; that the death of Mrs. Díaz Mojica was caused by the faulty and negligent acts and omissions of the Government of the Capital. As specific acts of negligence they alleged (1) that they failed to make the tests indicated by the medical science prior to injecting the achromycin shot to Mrs. Díaz Mojica and (2) that the defendant government "failed to maintain or keep available in said clinic the minimum medical facilities that science and prudence require to have at hand for use even in case where, notwithstanding having previously made the indispensable tests for the verification of the sensitivity to said injection, a shock might come unexpectedly requiring immediate treatment, as in the present case, with oxygen equipment, etc. and others, which would prevent the death of the patient thus affected."

The complaint was answered and the trial was held on the merits; the trial court rendered judgment dismissing the complaint after making the following

## "Findings of Fact

That on March 25, 1958, Nicolasa Díaz Mojica, wife of plaintiff Federico Pacheco and legitimate mother of coplaintiffs, appeared at the Municipal Hospital in Santurce, which is operated by the Government of the Capital, to receive medical

treatment for an ailment of the throat which was diagnosed as sinusitis, laryngitis, pharyngitis, for which Dr. Víctor M. Quiñones prescribed four (4) achromycin shots, the usual treatment in the medical practice in the community.

That Dr. Quiñones submitted the patient to an interrogatory in relation to the use of antibiotics, such as achromycin, and she answered 'that she never had adverse reactions to them.' He asked her whether she had ever had hives, dizziness, etc. to which she answered negatively. That next day she appeared at the clinic in Puerta de Tierra, property of the Government of the Capital, to get one of the achromycin shots prescribed by Dr. Quiñones taking along with her the injections and the prescription. There were no achromycin injections in the clinic. That the nurse made the skin test, the usual and normal practice for the administration of antibiotics, and it gave a negative reaction, for which reason the nurse proceeded to give her the first achromycin shot which she assimilated very well.

That next day, March 27, about 8:00 a.m. Nicolasa Díaz Mojica returned to the clinic to get the second achromycin shot, which was given to her by the same nurse. The patient went out and returned right away and sat down. The nurse asked her whether she was feeling sick to which she answered affirmatively. Immediately, the nurse called an ambulance, but as it was delayed she called a taxi and they went to the Municipal Hospital. Upon arriving at the hospital the lady died. The cause of her death was an anaphylactic shock, although it has never been known that achromycin has caused the latter.

The anaphylactic shock is produced by injecting into the body a foreign matter which being originally an antibiotic transforms itself into an antigen. In this case the achromycin is originally an antibiotic and when it is injected it is transformed into an antigen. In receiving the antigen the body develops what in medical terms are known as antibodies which attack the antigen thus producing the anaphylactic shock.

An adverse reaction to antibiotics like achromycin cannot be predicted even when the patient is submitted to a skin test and even when the patient has been injected on several occasions with the antibiotic, since it is an accepted medical principle that the test is not reliable, and it is likewise an accepted medical principle that even when the patient receives certain quantities of such antibiotics without having adverse reactions, a certain

point may be reached where the latter may develop an allergy thereto which may cause his death.

The test made in these cases is not controlling. The probabilities are that if a shot has not produced reaction, the others will not either. The detailed history given by the patient is more decisive than the skin test." (Tr. Ev. pp. 45 to 47.)

As legal grounds the trial court based its decision (1) on the doctrine established in the case of *Rivera* v. *Dunscombe*, 73 P.R.R. 764, 782 (1952); (2) in that the doctrine of *res ipsa loquitur* is not applicable, as a general rule, in cases of "malpractice" with the only exception of such cases in which the "malpractice" occurs while the patient is unconscious and his body is under the doctor's control, and (3) that the facts do not establish negligent acts or omissions on the part of defendant.

■ We agree with the trial court in that defendant's negligence is not inferred from the facts proved, and consequently the doctrine of *res ipsa loquitur* is not applicable. In *Hermida* v. *Feliciano*, 62 P.R.R. 54 (1943) and in other subsequent cases we have said that there are at least three requirements to apply said doctrine: (1) the accident ordinarily would not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action on the part of plaintiff. We added in *Kirchberger* v. *Gover*, 76 P.R.R. 851 (1954), that the doctrine was not applicable and there was no presumption of negligence where the facts showed that there was some other probable cause of the accident from which it may be inferred that there was no negligence and where the evidence was compatible with the probability of absence of negligence. "As may be observed [we said in *Community Partnership* v. *Presbyterian Hospital*, 88 P.R.R. 379 (1963)] the principle *supra* contemplates that against the inference of negligence—probable cause of the accident—

there should appear another cause from which, because it is *probable*, it may be inferred that there was no negligence. The *possibility* of the occurrence of an act would not be sufficient evidence to consider controverted the inference to be drawn from the occurrence of certain facts under certain circumstances on the basis of the doctrine of *res ipsa loquitur*."

■ In the present case the first element of the doctrine is absent. It cannot be inferred, from the death of a person as a result of an anaphylactic shock produced by the injection of antibiotics, that there was any negligence whatsoever, where the facts, as in this case, show (1) that the doctor who prescribed the antibiotic knew, through the interrogatory to the patient, that the latter was not allergic to antibiotics; (2) that the prescribed antibiotic was the proper treatment for the patient's ailment; (3) that prior to injecting the antibiotic to the patient the skin test was made giving negative results; (4) the first antibiotic shot injected had no reaction on the patient.

According to the expert testimony on the record the anaphylactic shock may supervene and cause the death even after taking all the precautions recommended by the medical science. The skin test may be negative and nevertheless the person may be allergic or hypersensitive to the specific antibiotic object of the test and the latter may suffer an anaphylactic shock if the antibiotic is injected. Furthermore, a person having no allergic antibiotic reaction history may tolerate, without having a reaction, one, two or more shots of a particular antibiotic and, still one of them, the third, fourth, or fifth may cause an anaphylactic shock causing his death.

The plaintiffs' predecessor died as a result of the anaphylactic shock suffered in receiving the second achromycin shot the day after the first shot was administered. Can negli-

gence be inferred from these facts? Can it be said that the accident would not have occurred in the absence of someone's negligence? Since these questions must be answered negatively, one of the essential conditions for the applicability of the *res ipsa loquitur* doctrine is absent. The death of a person as a result of an anaphylactic shock may occur in a few seconds. The allergy or hypersensitivity of the person to the antibiotic injected may cause shock and, consequently, often his death, even where no negligence was incurred in.

Plaintiffs also charged the Government of the Capital with specific acts of negligence consisting in having failed to make the skin test to Nicolasa Díaz on the day the second achromycin shot was administered and in having failed to have in the out-patient clinic in Puerta de Tierra, the technical facilities and equipment for the adequate treatment, to save her life, in the event the shot caused an anaphylactic shock, such as the presence of a doctor, oxygen, adrenalin, and surgical equipment to perform a tracheotomy. There is no doubt that on the day the anaphylactic shock occurred when achromycin was administered to Mrs. Díaz there were no doctors around in the out-patient clinic, or oxygen, or surgical equipment and although there were adrenalin injections in the clinic the nurse did not give one to the patient because she did not have the doctor's orders to do so.

According to the expert testimony in the record the treatment with adrenalin or antihistaminics, the application of oxygen, or a tracheotomy may save the life of a victim of an anaphylactic shock, although they do not always survive the shock notwithstanding being submitted to that treatment.[1]

■ It was incumbent on the plaintiffs to prove that the negligence of the Government of the Capital consisting in

---

[1] The medical publications report cases where although patients are given treatment of antihistamine and oxygen they have died as a result of the anaphylactic shock. See Feinberg and others, *Penicillin Anaphylaxis, Non Fatal and Fatal Reactions*, 152 J.A.M.A. 114.

the lack of the previously indicated facilities was the immediate cause of Mrs. Díaz' death. That is, plaintiff should have established by means of expert testimony that the death of Mrs. Díaz occurred as a result of having failed to administer to her the proper treatment to help her recover from the anaphylactic shock. In other words, defendants were bound to establish that the woman's death was caused by the alleged negligence of the Government of the Capital, that is, that Mrs. Díaz would have survived had treatment been given to her to counteract the anaphylactic reaction. In the absence of evidence to the contrary we cannot decide, except on the basis of conjectures and speculations, that the cause of Mrs. Díaz' death was the lack of means and facilities in the out-patient clinic to administer to the patient the treatment against the allergic reaction produced by the achromycin shot. The evidence having failed to produce the causal connection, plaintiffs' action cannot prosper. See *Huffman* v. *Lindquist*, 234 P.2d 34 (1951); Louisell and Williams, Trial of Medical Malpractice Cases 324, § 11.20; *Sáez* v. *Municipality*, 84 P.R.R. 515, 524–25 (1962).

The judgment appealed from will be affirmed.